UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                          - against -                              10 CR 349 (RPP)
                                                                   **OPINION AND ORDER**

ALLEN BLAKE and CHANDRA LASONDE,

                          Defendants.
----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.:**

On July 5, 2010, Allen Blake filed a motion for a new trial pursuant to Federal Rule of

Criminal Procedure 33.[1]  For the reasons that follow, Blake's motion is denied.


## I.   FACTUAL BACKGROUND

Allen Blake ("Blake") and Chandra LaSonde ("LaSonde") (together, "Defendants") are

Correctional Officers employed by the City of New York Department of Correction, and until

November 20, 2009 were members of the Executive Board of the Correctional Officers

Benevolent Association ("COBA").

In May 2008, Blake filed for divorce from his estranged ex-wife, Pearl Blake.

(Government Exhibit 7 ("GX 7").)  The divorce was approved on June 23, 2009.  (Government

Exhibit 4 ("GX 4").)  He was represented by the law firm of Koehler & Isaacs, which had a

contract to represent COBA and COBA members.  (Trial Transcript ("Tr.") 613.)  On September

29, 2009, Pearl Blake died at her home in South Carolina.  (Government Exhibit 12 ("GX 12");

Tr. 332.)  On October 23, 2009, Blake submitted an application to the Prudential Life Insurance

Company of America for a $10,000 death benefit for Pearl Blake's death.  (Government Exhibit

---

[1] Blake's motion was filed six days after the 14-day time period granted by the Court and provided in Fed. R. Crim. P. 33(b)(2).  In the interest of justice, the Court will review the untimely motion on its merits, but it notes that this is an independent ground for denial of this motion.

3 ("GX 3"); Tr. 322.)  COBA members are entitled to a $10,000 insurance benefit upon the death of their lawful spouse.  (Tr. 307, 332)  On Blake's application for the death benefit, "relationship to deceased" is listed as "husband."  (GX 3.)  A cover letter accompanying the application for the death benefit was signed by LaSonde and instructed the recipient to "contact Chandra LaSonde" in the event that "there are any questions in regards to expeditiously completing this claim." (<u>Id</u>.)

At an emergency COBA Board meeting on November 20, 2009, Norman Seabrook, the President of COBA, confronted Blake and asked him to "[e]xplain to me how this death benefit [claim] is put in and you don't have the [supporting] documents."  (Tr. 592.)  Blake "just shook his head, " and Seabrook demanded both Blake and LaSonde's "resignations . . . by close of business."  (<u>Id</u>. 593, 594.)

On April 20, 2010, Defendants were indicted by a grand jury of the crime of devising and implementing a scheme to use the United States mails to submit a false claim to an insurance company for a life insurance benefit to which Blake was not entitled in violation of 18 U.S.C. §§ 1341 and 1342.

On June 15, 2010, the jury found Blake guilty of mail fraud, in violation of 18 U.S.C. § 1341.  (<u>Id</u>. 873.)  LaSonde was found not guilty and the Court entered a Judgment of Acquittal as to her.  (<u>Id</u>. 874; Judgment of Acquittal, June 15, 2010.)

The main issue at trial was whether Blake and LaSonde possessed knowledge that Blake's divorce had been finalized on or before October 23, 2009, the date Blake submitted an application for a dependent life insurance claim for the death of Pearl Blake.  At trial, the Government provided testimony from five witnesses, as well as documentary evidence, in

support of its case that Blake committed mail fraud by knowingly submitting a false life insurance claim to receive a $10,000 death benefit based on the death of his ex-wife Pearl Blake.

Joseph Bracco, another member of the COBA Executive Board, testified that he and Blake were friends.  Bracco also testified that on September 29, 2009, Blake told him that "his ex-wife had passed away" and that Blake was going to South Carolina for the funeral.  (Id. 435.) Bracco, who had previously worked in the COBA Pension Department, also testified that Blake stated that "he had just recently became [sic] divorced in July…" and that Blake asked Bracco whether there was a "grace period" for the insurance benefit.  (Id. 438.)

Norman Seabrook testified that sometime in September 2009, Blake told him, "[m]y ex-wife died."  (Id. 589.)  Seabrook also testified that, when confronted at the COBA Board meeting on November 20, 2009 about filing for the death benefit claim, "[Blake] looked at me and he said, 'I fucked up.'"  (Id. 593.)

Thomas Farrell, a COBA Board Member testified that Blake told him, also in September 2009, that his "ex-wife died."  (Id. 654.)  According to Farrell, Blake then complained to him, "[i]f that bitch or broad would have died a couple of months earlier, I would have gotten the money."  (Id.)

Elias Husamudeen, the First-Vice President of COBA, testified that in February 2010, as he was cleaning out Blake's office, he came across a "letter, an envelope, addressed to Allen Blake from the law firm of Koehler and Isaacs" and that the envelope had been opened.  (Id. 538.)  Husamudeen also testified that COBA mail logs showed that the letter was received at the COBA office and "logged into the system on July 23, 2009."  (Id. 543; GX 9.)  The mail log was admitted into evidence without objection.  (Tr. 542.)

A paralegal from Koehler & Isaacs, Claudia Tejada, testified that on July 13, 2009 she "called Mr. Blake and . . . told him that . . . his divorce was signed" and that she "was going to get a copy [of the judgment of divorce] from the court and . . . forward it to him." (Id. 508.) Tejada also testified that on July 21, 2009, when she "got the judgment of divorce from the court, [she] generated that letter and . . . put it together with the judgment of divorce and sent it to Mr. Blake" in a Koehler & Isaacs envelope postmarked July 21, 2009. (Id. 510-11, 519.) The letter she referred to in her testimony is dated July 21, 2009 and was marked as Government Exhibit 6 ("GX 6") and was admitted into evidence without objection. (Tr. 510.) It was addressed to Blake at the COBA office and stated the following:

> Dear Mr. Blake: Enclosed please find certified a copy of your Judgment of Divorce. Please keep it in a safe place. If you have not already done so, you should review your pension plan and Will beneficiary designation, account beneficiary designation, and other pertinent documents, and make the necessary changes so that the documents reflect your most current wishes. I am closing your matrimonial file at this time. If you need legal assistance in the future, please feel free to call our office. (GX 6.)

Tejada further testified that the judgment of divorce (GX 4) was dated July 7, 2009, "the date that it was actually filed in the [office of the] county clerk." (Tr. 514.) The parties stipulated that GX 4 was "an official public record of the judgment of divorce" and GX 4 was also admitted into evidence without objection. (Id. 513.)

GX 4, a certified copy of the original Judgment of Divorce from the New York Supreme Court dissolving the marriage between Blake and Pearl Blake, was signed by a judicial referee and the county clerk on June 23, 2009 and was filed with the New York County Clerk's Office on July 7, 2009. It also bears a certification stamp on the second page that reads: "State of New York, County of New York , SS: I, Norman Goodman, County Clerk and Clerk of the Supreme Court, New York County, do hereby certify on 2010 Jun – 1 A 11:39 that I have compared this

copy with the original filed in my office on 7/7/09 and that the same is a correct [copy]."  (GX 4.)

After the Government rested, Blake presented the testimony of one witness and introduced one set of documents into evidence.  Investigator Jacqueline Maquine, an employee of the New York City Department of Investigations, testified that in December 2009, she conducted an interview with Bracco and that she memorialized that statement in a written report, which was somewhat inconsistent with his testimony, identified as Government Exhibit 11 ("GX 11").  (Tr. 712-15.)  Blake also moved for admission into evidence of the entire file for Blake's policy with the Prudential Life Insurance Company ("Blake A"), which included a copy of the judgment of divorce filed in the County Clerk's office on July 7, 2009 with a timestamp of July 11, 2009. (Tr. 734-39.)  Outside the presence of the jury, counsel for Blake argued for admission on grounds that the timestamp on the judgment of divorce that was in evidence, GX 4, did not correspond with the timestamp on the judgment of divorce on file with Prudential and as contained in Blake A. (Id. 738.)   The Government objected to the introduction of the Prudential file because it was "unduly cumulative" and would "confuse the jury."  (Id. 736-37.)  The Government further explained that

> the document that's in the Prudential file is time-stamped July 11, 2009. Government Exhibit 4 that's been admitted into evidence and that the parties stipulated to contains a time stamp of June 1st, 2010. The reason why that is, your Honor, is that the Department of Investigation, as they were preparing for this case, went to the family court to obtain a certified copy of that judgment. We have that copy. We have the actual original certified copy. This time stamp reflects that.  You can read it, your Honor. . . . . These documents are the exact two same documents -- they're the exact document, which is the judgment of divorce dated July, 7, 2009.  (Id. 734.)

Blake A was admitted into evidence over the Government's objection.  (Id. 742.)

## II.   DISCUSSION

Blake argues that he is entitled to a new trial because: (1) the testimony of Claudia Tejada, in which she stated that she mailed a certified copy of the judgment of divorce to Blake along with her letter to Blake of July 21, 2009, GX 6, was "patently incredible and defies physical realty [sic]"; and (2) the prosecution failed to disclose the source of GX 4, which constituted a <u>Brady</u> violation.

**A.      Standard of Review**

Federal Rule of Criminal Procedure 33 permits the court to grant a defendant's motion for a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  <u>United States v. Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir. 1992). Generally, trial courts "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."  <u>United States v. LeRoy</u>, 687 F.2d 610, 616 (2d Cir.1982).  A new trial is appropriate where there is a "real concern that an innocent person may have been convicted."  <u>Sanchez</u>, 969 F.2d at 1414.

**B.      Credibility of Government Witness Claudia Tejada**

A court may reject the jury's assessment of a witness's credibility where testimony is "patently incredible or defies physical realities."  <u>Sanchez</u>, 969 F.2d at 1414.  Blake argues that "it is patently incredible and defies physical realty [sic] for Claudia Tejada to have mailed a document to Allen Blake on July 21, 2009, when that document, as introduced into evidence, was not generated until 11 months later in June 2010."  (Def. Mem. 3.)  Blake additionally contends that a verdict based on such information is a manifest injustice requiring a new trial.

(Id.)  In response, the Government states that such an argument "misstates the trial record" because "contrary to Blake's motion, at no point during the trial did Tejeda testify that she mailed out the exact copy of the document which was admitted into evidence as GX 4 to Blake." (Memorandum of Law of the United States of America in Opposition to Blake's Motion for a new Trial ("Opp. Mem.") at 9) (emphasis in original.)  Examination of the record supports the government's position.

Tejada testified: "on July 21st, when I got the judgment of divorce from the court, I generated that letter, and I put it together with the judgment of divorce and sent it to Mr. Blake." (Tr. 519.)  Tejada identified "that letter" as the cover letter in GX 6 but never identifies GX 4, the judgment of divorce, as the same document that she sent to Blake.  (Id.)  Indeed, because Tejada testified that she had mailed the copy of the judgment to Blake on July 21, 2009, she could not have retained the copy she mailed to Blake.[2]  The Government readily admits, as it admitted at trial (Tr. 734) that "Tejada could not have mailed out GX 4 to Blake" because the judgment of divorce was a certified copy obtained in preparation for this trial from the state court on June 1, 2010.  (Opp. Mem. at 10.)  The only difference between the two copies of the same document is the time stamp on GX 6 containing certifying information by the Clerk of the Supreme Court of New York County.  Tejada's testimony that she mailed Blake a certified copy of the judgment of divorce does not conflict with the Government's use of another certified copy of the judgment of divorce as GX 4.

Similarly, Tejada's testimony is not false because GX 6, the envelope and letter, did not include the judgment of divorce.  (Ricco Declaration ("Ricco Decl.") at 3-4.)  Rather, the jury

_____

[2] It would appear that the copy of the judgment of divorce in the Prudential file, time stamped July 11, 2009, was a copy of the judgment of divorce Tejada testified she sent with her letter of July 21, 2009.

was free to draw its own inferences from the absence of the original judgment of divorce from GX 6.

Blake also argues that it is "patently incredible" and "defies physical reality" that the envelope admitted as GX 6 was ever mailed by Tejada or ever went through the United States Postal Service because it "lacks any markings" consistent with being handled and processed by the Postal Service which directly conflicts with her testimony.  (Ricco Decl. 4.)  The Court and the jury had the opportunity to physically examine and hold GX 6 during the course of the trial. The envelope contains markings consistent with processing through the United States Postal Service.  Specifically, the envelope bears an adhesive barcode label that appears to have been affixed to the envelope while being processed by the Postal Service.  (See GX 6.)  Tejada's testimony that she mailed GX 6 to Blake is corroborated by mail log records showing that Blake received a letter from Koehler and Isaacs on July 23, 2009.  (GX 9.)  Second, Elias Husamudeen, an officer of COBA, found Tejada's letter of July 21, 2009 in an opened envelope addressed to Blake amongst other things in Blake's office when he cleaned it in February 2009.  (Tr. 537-38.) Furthermore, Blake examined GX 6 during trial and did not object to its admission into evidence or the publishing of GX 6 to the jury.  (Tr. 510.)  Because of the substantial evidence corroborating Ms. Tejada's testimony that she mailed a copy of the divorce decree to Blake and because her testimony does not appear incredible or implausible, as claimed by Defense counsel, the Defendant is not entitled to a new trial on this ground.  See United States v. Haouari, No. S400CR.15 (JFK), 2001 WL 1154714, at *5 (S.D.N.Y. Sept. 28, 2001) (rejecting Rule 33 motion because Government witnesses were credible and were corroborated by each other and documentary evidence).

**C.  Brady Violation**

8

Blake next contends that he was not informed that GX4 had been issued on June 1, 2010 — the copy of the judgment of the divorce — until after the Government rested its case. (Ricco Decl. 5.)  Blake argues that the Government's failure to disclose this information is a <u>Brady</u> violation warranting a new trial, or, in the alternative, an evidentiary hearing to determine whether the Government committed a <u>Brady</u> violation. (<u>Id</u>. 6-7.)

In <u>Brady v. Maryland</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963).  The Second Circuit applies a three-factor test in determining whether a <u>Brady</u> violation has occurred: (1) the evidence at issue must be favorable to the accused as either exculpatory or impeaching, (2) the evidence must have been suppressed by the State either willfully or inadvertently, and (3) prejudice must have resulted. <u>United States v. Rivas</u>, 377 F.3d 195, 199 (2d Cir. 2004) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).

Blake's counsel argues that Blake was prejudiced by the Government's failure to inform him that GX 4 was obtained by an investigator on June 1, 2010 in preparation for this trial and that this information would have altered his opening statement, his cross-examination of Government witnesses Claudia Tejeda and Elias Husamudeen, and his decision to enter into a stipulation with the Government to introduce GX 4 into evidence.  (Ricco Decl. 4, 6.)  Blake also argues that the origin of GX 4 was material to the jury's determination of guilt or innocence.  (<u>Id</u>. 7.)

His arguments fail, however, because the Government did not suppress the source of GX 4.  The second page of GX 4 indicates plainly and clearly the date that it was obtained from the

New York Supreme Court.  The stamp on the second page of GX 4 reads: "State of New York, County of New York , SS: I Norman Goodman, County Clerk and Clerk of the Supreme Court, New York County, do hereby certify on 2010 Jun – 1 A 11:39 that I have compared this copy with the original filed in my office on 7/7/09 and that the same is a correct [copy]."  (<u>See</u> GX 4.) Blake had ample opportunity to review GX 4, ascertain its source from the information on the face of the document, and prepare for trial accordingly.  Indeed, the trial record indicates that he did.[3]  (Tr. 737-38.)  Blake also had the opportunity to review GX 4 before signing the stipulation and to object to the admission of GX 4 into evidence at trial.  Lastly, Blake allowed the admission of GX 4 into evidence "[w]ithout objection."  (<u>Id</u>. 513.)  The fact that source information appeared on the document itself undermines his claim that this information was "suppressed" by the Government or that the Government "sandbagged" him by disclosing the source of GX 4 midway through trial.

Additionally, any possible prejudice to Blake was negated when Blake introduced Blake A, the entire Prudential file, containing a copy of the judgment of divorce, into evidence.   Blake argued at trial that "the real copy of the judgment [of divorce]" was in the Prudential file and that it "[c]ould be that somebody made a mistake," when referring to Tejada's testimony about sending GX 4 to Blake.[4]  (<u>Id</u>. 796.)  The jury was able to review and compare the documents to analyze the credibility of Claudia Tejada.  Because no evidence was suppressed and because Blake argued these issues to the jury, no <u>Brady</u> violation occurred.

---

[3] At sidebar, counsel for Blake stated: "So, Judge, I just -- the slick lawyer just looked at the document that was in evidence and said that the document in evidence, the one that's in evidence does not correspond with that, because the document in evidence says that the judgment of divorce that's before the jury was gotten at some other time and place.
So when I subpoenaed the records from Prudential, I subpoenaed the records and I read the documents, and when I got to the judgment of divorce, I noticed that the judgment of divorce that is in the subpoenaed documents was different."  (Tr. 738.)
[4] As was previously noted, Tejada's testimony does not indicate that she mailed GX 4 to Blake.  Her testimony only indicates that she sent GX 6, the cover letter and envelope, to Blake, along with a copy of the divorce decree.

### III.  CONCLUSION

For the reasons stated above, Blake's motion for a new trial pursuant to Fed. R. Crim. P. 33 is denied.

SO ORDERED.

Dated: New York, New York
August 9 , 2010

Robert P. Patterson, Jr.
United States District Judge

11

Copies of this document were faxed to:

**Counsel for Plaintiff:**
Santosh Shankaran Aravind
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2264
(212) 637-2937 (fax)

**Counsel for Defendant:**
Anthony L. Ricco
Law Office of Anthony L. Ricco
20 Vesey Street
New York, NY 10007
(212)-791-3919
(212) 791-3940 (fax)

Natali J.H. Todd
Law Office of Natali J.H. Todd P.C.
189 Montague Street
Suite 508
Brooklyn, Ny 11201
(718) 797-3055
(718) 504-3900 (fax)